**UNITED STATES of America,
Plaintiff,**

v.

**Keith BEAUCHAMP, Wayne Beauchamp and Dean Cooperative Bank, Defendants.**

**Case No. 07–211 S.**

United States District Court,
D. Rhode Island.

May 4, 2009.

Robert J. Kovacev, U.S. Department of Justice, Tax Division, Washington, DC, for Plaintiff.

James P. Marusak, Gidley, Sarli & Marusak, Providence, RI, for Defendants.

## DECISION AND ORDER

WILLIAM E. SMITH, District Judge.

Before the Court are cross-motions for summary judgment. The dispute involves what the United States describes as a complex income tax evasion scheme dating back to 1993 involving a residential property in Narragansett, Rhode Island. With its Complaint pursuant to 26 U.S.C. § 7403 and instant motion, the United States seeks to foreclose on the property to satisfy a tax lien. The now-record title owners, brothers Keith and Wayne Beauchamp (who by all accounts never engaged in or had notice of any fraudulent conduct), vigorously object and contend that the lien is null and void, extinguished by the United States' own inaction. After careful consid-

eration, for the following reasons judgment will be granted in favor of Defendants.[1]

### I. *Background*

The events engendering this conflict are largely undisputed, though the validity of each transaction in the title chain is not clear cut. The Court describes each step by what it purports to be, and then summarizes the United States' (hereinafter referred to as the Government) theory as to the underlying fraud. The ranch style residence at the center of this dispute is located at 25 Raymond Drive in Narragansett. It was built in 1977 and has a current assessed value of approximately $475,000. The first owner for instant purposes was Nomar Realty Trust (Nomar), which took title in 1988 with Jeffrey Rose as Trustee.[2] In 1993, Nomar granted and duly recorded a mortgage on the property to Kaleb Realty General Partnership (Kaleb) for $52,000, 16.75% per annum interest with monthly payments due. In 2002, Nomar as owner granted the property to Borland Realty, Inc. (Borland). In 2004, the Internal Revenue Service (IRS) assessed and recorded a lien on the property for unpaid income taxes from tax years 1993 to 1997 totaling $709,961[3] against Jeffrey Rose and (then-owner) "Borland Realty, Inc., As Nominee, Alter Ego, Or Transferee of Jeffrey Rose." The recorded liens do not mention Nomar or Kaleb.

In July of 2005, Kaleb assigned its $52,000 mortgage (given in 1993) to Raymond 25 Associates, LLC. (Raymond), an entity that appears to have been comprised of three individual principals. Following the assignment, in December of

---

1. Beauchamps' mortgagee Dean Bank was named as a defendant with an interest in this action pursuant to 26 U.S.C. § 7403(b).

2. Nomar took title from an entity called Mirror Enterprises. It is unclear (and irrelevant to this decision) whether this was an independent bona-fide entity or also one involving the notorious Mr. Rose.

3. The amount of tax Mr. Rose owes appears undisputed.

2005 Raymond, through its counsel John Sheehan, provided notice of its intention to foreclose upon the $52,000 mortgage (the amount then due with interest was $427,621.85) pursuant to 26 U.S.C. 7425(c)(1). Notice was provided via certified mail return receipt requested to the IRS offices in both Andover, Massachusetts and Warwick, Rhode Island. The IRS received the notices but did not contact Raymond as the senior foreclosing creditor, nor respond or otherwise object to the foreclosure or attempt to redeem the property.

On January 19, 2006, Raymond (the only bidder) foreclosed on the mortgage and took title to the property from then-owner Borland by a duly recorded foreclosure deed. On or about May 12, 2006, Raymond and Defendant Keith Beauchamp (represented by counsel) entered into a purchase and sale agreement for the property, with a purchase price of $330,000. Keith and Wayne Beauchamp then took title from Raymond by quitclaim deed dated June 28, 2006. It is undisputed that this conveyance occurred more than 120 days after the January 19, 2006 Raymond foreclosure sale.[4] Dean Bank currently holds a commercial mortgage on the property dated June 28, 2006, granted by the Beauchamps in the amount of $344,000.[5]

Prior to closing, the Beauchamps, Dean Bank and/or their attorney discussed the Government's 2004 tax lien with Raymond's attorney Mr. Sheehan and, according to Mr. Sheehan, discussed the "complex title . . . relating to the timing or the priority . . . of liens and on the United States statute in connection with foreclosures and the right [of] the U.S. Government as far as a foreclosure sale occurred." At the buyer's request, prior to closing Mr. Sheehan provided an affidavit in which he set forth to whom notice of foreclosure was sent (IRS, Nomar, JEV Financial Corp., Borland, and Kaleb), and affirmed both that he had received certified mail receipts from the IRS (which were presented) and that no party had contacted Raymond following the sale.

## II.  *The Government's Theory*

The Government's characterization of these facts is as follows: Jeffrey Rose [6] used 25 Raymond Drive to evade paying federal income taxes. The first owner, Nomar, was merely a nominee of Rose; Rose was Trustee and enjoyed the benefits of and exercised control over the property. The $52,000 mortgage from Nomar to Kaleb in 1993 was "bogus" and secured no real obligation because Kaleb was yet another sham. According to a "Kaleb Realty Partnership Agreement," the partners who supposedly provided the loan were Rose, his father and the "Rose Family Trust." The amortization schedule Raymond provided to the Beauchamps at or prior to closing suggests Nomar made no payments on the mortgage.

Borland, which took title from Nomar in 2002, was also a sham entity; Rose was sole officer, director and shareholder. In 2004, after the IRS lien, Rose devised a plan to circumvent the lien, sell the property to an unknowing purchaser, and walk away free and clear of the Government's

---

**4.**  As will be discussed below, 120 days is the applicable period within which the IRS had the right to redeem the property following foreclosure. 26 U.S.C. § 7425(d).

**5.**  Beauchamps applied the Dean Bank loan to the purchase price and to fund substantial renovations to the property.

**6.**  The Government represents that Mr. Rose left the United States in 2003 and that his current whereabouts are unknown.

interest. To do this, Kaleb assigned the $52,000 "mortgage" to yet another sham entity: Raymond.[7] To wipe out the junior tax lien, Raymond held a foreclosure sale and bought the property for $300,000.

The potential hiccup in this plan was the foreclosure notice Raymond as purported senior lien holder would have to provide to junior lienholders of record—namely, the IRS. There is no dispute Raymond fulfilled its statutory obligations in this regard. According to a document submitted by the Government, Rose enlisted Attorney Sheehan and others to follow a wait and see approach with respect to the IRS:

> Raymond 25 will present the first bid for the property at the foreclosure with a bid of, oh say $425,000. In the event the IRS wishes to exercise it's [sic] rights to redeem it will have to pay the bid price.
>
> . . . .
>
> In the above manner, all are protected. Our side goes through the expense and effort of the foreclosure, your father's side is secured for the purchase price pending the 120 day time period and the deal is done. In the event IRS rears it's [sic] head in any significant degree, (files a court challenge), we either fight, negotiate with them or collapse our tents and go home.

Gov't Ex. 6 to Statement of Undisputed Facts (No. 23–7).

The IRS did not "rear its head," and the Beauchamps bought the property following foreclosure. Following the Government's theory, Rose and his "partners" walked away with the proceeds—but at whose expense: the Beauchamps or the Government? That is the pivotal question in this case, and it offers an unsatisfying choice between the lesser of two evils.

### III. Standard of Review

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it has the "potential to affect the outcome of the suit." *Velazquez–Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.3d 11, 15 (1st Cir.2007) (citations omitted). The Court reviews the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir.1997). "[C]ross-motions for summary judgment neither dilutes nor distorts this standard of review." *Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co.*, 486 F.3d 727, 732 (1st Cir.2007) (quoting *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir.2006)). The Court simply determines if either party deserves judgment on undisputed facts. *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir.2007).

### IV. Preliminary Legal Principles

Upon assessment in 2004, it is undisputed a tax lien arose on Jeffrey Rose's property. *See* 26 U.S.C. §§ 6321, 6322. Such a lien continues in effect until the liability is satisfied, or the lien is lifted by statute, or withdrawn or becomes unenforceable. *Id.* at §§ 6322, 6323(a). It continues to attach to Rose's property regardless of

---

7. According to deposition testimony, the agreement was that Raymond would not provide the agreed "consideration" ($250,000) for the assignment of the Kaleb mortgage until after Raymond successfully foreclosed and was assured the IRS exhausted its right of redemption. This was expressly provided for in a section of Kaleb/Raymond agreement entitled, "Election by the Internal Revenue Service not to redeem the Premises during the application period provided by statute."

subsequent transfers or sales, but is not valid against certain perfected "first in time, first in right" prior interests, such as a security interest perfected by a recorded mortgage. *Id.* at § 6323; *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 720–21, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). It is well-settled that a properly conducted foreclosure of a mortgage terminates interests that are junior to the foreclosing mortgagee, assuming junior lienholders are joined or notified per applicable law, and subject to any statutory redemption rights those junior lienholders may have. *See* Restatement (Third) of Prop.: Mortgages § 7.1 (1997).

The United States has a "formidable arsenal of collection tools" at its disposal when seeking to recover a tax debt. *United States v. Verduchi,* 434 F.3d 17, 19–20 (1st Cir.2006) (quoting *United States v. Rodgers,* 461 U.S. 677, 683, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983)). In a case involving alleged fraud to evade tax obligations, the Government may (as it did here) bring an action pursuant to 26 U.S.C. § 7403 to enforce a lien, or alternatively may sue one or more transferees of the taxpayer. *Verduchi,* 434 F.3d at 19–20.

## V. *Potential Disputed Facts*

The threshold question here is whether, as a matter of law, one or more of the so-called Rose transactions were fraudulent, or whether this is an issue of fact that precludes summary judgment for the Government, the Beauchamps, or both. This is critical, because the Government concedes its theory of why the tax lien continues to attach is premised upon a finding that the 1993 Kaleb mortgage was a fake. If the Kaleb mortgage secured a genuine obligation, everyone agrees the junior IRS lien would have been extinguished in foreclosure and the parties would not be where they are today. The Government suggests

the Court can make this fraud finding on the current record, in large part because Beauchamps have not denied many proposed undisputed facts as to Rose and his alleged spurious dealings. The Beauchamps' response is that they are in no position to prove or disprove anything about Rose or these entities, but regardless, they are entitled to judgment even if the Court were to accept the Government's fraud theory *in toto.*

For starters, the Court disagrees with the Government that no material, genuine facts are in dispute. Whether the Kaleb mortgage was fraudulent and/or whether 25 Raymond Drive was fraudulently transferred are matters of Rhode Island state law. *See Comm'r of Internal Revenue v. Stern,* 357 U.S. 39, 45, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958); *Aquilino v. United States,* 363 U.S. 509, 512–13, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960); R.I. Gen. Laws § 6–16–4. There is no question the documents and deposition testimony presented thus far create strong suspicion of fraud. But it is difficult to answer this highly fact intensive, transaction-specific question with the premature and broad brush factual picture offered by the Government. *See Budd v. Comm'r of Internal Revenue,* 43 F.2d 509, 512 (3d Cir.1930) ("[F]raud is never to be presumed, and he who avers it, takes upon himself the burden of proving it."). Indeed, on the current record, nothing proves that *as of 1993* Rose created the all-important Kaleb mortgage intending to hinder, delay or defraud the IRS, or that the IRS was even a creditor or anticipated creditor at that time or anytime before its assessment in 2004. *See Hart v. United States,* 207 F.2d 813, 816 (8th Cir. 1953) (mortgage executed by then-insolvent taxpayer was fraudulent when made for the purpose of defeating the Government's tax claims). The fact that Rose may have held the property in trust(s) and that entities in the title chain included

friends and/or family is not *per se* fraud let alone unusual. In sum the fraud theory is plausible if not likely, but at this juncture it requires too many assumptions.

The Court is thus left with two options. First, set the case for trial and put the Government to its burden of proof as to whether one or more of the transactions were made with intent to defraud the IRS and should be voided. That option, however, begs the question of whether such a finding even matters to the ultimate outcome in the case. And this question leads to the second option: consideration of whether the Beauchamps would deserve judgment even if the Government successfully proved its fraud theory at trial?

## VI. *Beauchamps' Contention*

The Beauchamps contend that even if the Court assumes the Kaleb mortgage was a sham, the tax lien was discharged with respect to this property following the Raymond foreclosure. In the context of foreclosure, a dutiful bona-fide purchaser—and reasonable attorney or title examiner for that matter—would rely on the senior priority of the Kaleb mortgage over the tax lien and understand that such a foreclosure would result in clear title, so long as proper notice was given to the IRS and so long as the IRS never objected or redeemed the property. The Government, say the Beauchamps, cannot rewind the clock to erase this first-in-time priority

(through which the Beauchamps took title as innocent successors) and somehow now retroactively assert its tax lien against Nomar or Kaleb. The Beauchamps highlight what is obviously a critical fact—the IRS received proper notice of Raymond's foreclosure in 2005 and sat on its hands. The fraud was laid out right under the Government's nose, so the argument goes, and the IRS did not or chose not to snuff it out. By not getting involved, the lien was surrendered by operation of 26 U.S.C. § 7425(b). In other words, the Government's mea culpa effort in this litigation is too little, too late.[8]

## VII. *Government's Response*

The Government disputes that the Beauchamps would be entitled to judgment even if the Court found the Kaleb mortgage and Raymond foreclosure to be fraudulent. It acknowledged during argument, however, that release of the tax lien per § 7425 "conceivably" could apply, but did not in this case for two reasons. The first reason proffered by the Government is that the Beauchamps' theory is really one of equitable estoppel or laches against the United States, which must fail absent some affirmative IRS misconduct, of which there is none. The second and more fundamental reason is that, put simply, the law never recognizes sham transactions, so the IRS had absolutely no obligation to

---

**8.** Defendants advance an alternative argument that even if the lien remains, creditor Dean Bank should nonetheless have priority over the Government under the doctrine of equitable subrogation. Though this concept is a flexible one and has been recognized in this District, *see Potter v. United States,* 111 F.Supp. 585, 588–89 (D.R.I.1953), it is an open question whether the Court could apply it in these circumstances to allow subrogation to a mortgage once believed valid but later deemed fraudulent. The authority Defendants cite suggest it could, but resolution of

this issue is unnecessary given the Court's conclusion that the lien was discharged with respect to 25 Raymond Drive. Moreover, one should question why, if creditor Dean Bank is placed ahead of the tax lien, the equally innocent homeowners should be forced to bear alone the burden of such an unexpected and significant encumbrance—leaving them with absolutely no equity in their home. Dean Bank and the Beauchamps stand on equal footing, and if one can extricate itself from the Government's lien, then so too should the other.

respond to a facially valid notice of foreclosure of a mortgage void *ab initio.*

VIII. *Discussion*

█ In general, a lien in favor of the United States is *not* disturbed by a nonjudicial sale of property. 26 U.S.C. § 7425(b) ("a sale of property on which the United States has or claims a lien . . . shall . . . be made subject to and without disturbing such lien or title"). However, there is an exception. A government lien may be disturbed if the IRS receives notice of the sale in accordance with statutory and regulatory requirements. *See* 26 U.S.C. § 7425(c)(1); 26 C.F.R. § 301.7425–3(d)(1)(i)–(iv) (detailing particular items to be included in notice to IRS of non-judicial foreclosure sale). When timely notice is provided, and the foreclosing party does not receive from the IRS before the sale "written notification of the items of information which are inadequate," 26 C.F.R. § 301.7425–3T(d)(2), then the notice operates to "extinguish the government's lien once the sale [is] consummated." *Whiteside v. United States,* 833 F.2d 820, 822 (9th Cir.1987) (defect in notice of sale to IRS by trustee cured when IRS failed to object and preserve its rights and thus lost lien); *see Tompkins v. United States,* 946 F.2d 817, 821 (11th Cir.1991) (proper notice of non-judicial foreclosure sale divests

property of government lien). Moreover, Congress has provided that as to a foreclosure sale of property encumbered by a federal tax lien, the IRS may redeem the property "within the period of 120 days from the date of such sale or the period allowable for redemption under local law, whichever is longer." 26 U.S.C. § 7425(d)(1).[9]

It goes without saying that the facts of this case do not neatly fit the above framework for discharge of a tax lien. This is because although the foreclosing notice was facially adequate and, in the usual course, would result in discharge, here the argument is that the foreclosure was substantively defective because of a bogus mortgage. Though the parties do not frame it as such, the real issue presented by this remarkable chain of events is whether fraud is an exception to (or outside the scope of) the lien discharge provisions of § 7425. If yes, the IRS inaction is of no concern, the lien remains, and the Government can foreclose on the Beauchamps' property. If no, the IRS inaction upon receipt of proper foreclosure notice means the Government has lost its lien on 25 Raymond Drive.

This question is not easy, and it is worth emphasizing that the answer is driven by the peculiar facts at hand, combined with the rationale behind § 7425.[10] Starting

---

9. Though it hardly matters in this case given that the IRS never intervened or sought to redeem, no one suggests Rhode Island provides a different redemption period or different process by which a lien is discharged.

10. The parties have not cited, and the Court has not uncovered, any case close to the anomalous facts here—a bona fide purchase of a property following foreclosure of a mortgage once senior to a junior tax lien but years later *following proper statutory notice* believed to have been fraudulently created. Almost all the authority on which the Government relies involves somewhat typical, timely actions to set aside fraudulent transactions (for example,

when a parent conveys property to his child in anticipation of or following a tax lien) or actions to foreclose property held by nominee entities (*see, e.g., United States v. Cohn,* 682 F.Supp. 209 (S.D.N.Y.1988)). The key distinguishing wrinkle in this case is the foreclosure, facially proper notice pursuant to § 7425(b), and subsequent purchase by a bona-fide third-party. In short, the Court agrees with Defendants that "this is not a simple case of seeking to undo a fraudulent transaction in order to reach the assets of a taxpayer which the taxpayer sought to hide from the Government."

with the statute, the purpose of notice of a non-judicial sale on which the United States has a lien is to allow the Government to "review its position and determine the appropriate action." S.Rep. No. 1708, 89th Cong., 2d Sess., reprinted in 1966 U.S.Code Cong. & Admin. News 3722, 3748; *see also First Am. Title Ins. Co. v. United States,* 848 F.2d 969 (9th Cir.1988) (statute assures that government can protect its interest in having a fair sale); *Tompkins,* 946 F.2d at 821 (§ 7425 "allows the IRS to maintain the status quo of its lien."); *Galesi v. United States,* 406 F.Supp. 623, 625–27 (D.Vt.1976) (prior to § 7425, "government was prevented from taking steps to protect its interests in collection of revenues," and the "Congressional purpose in the enactment was to prevent the discharge of subsequent and subordinate federal tax liens without notice to the federal taxing authority"). The main idea, then, is that the IRS deserves the opportunity to review its position with respect to a delinquent taxpayer's property in which the Government has an interest. This prevents the Government from unknowingly losing out on a tax collection opportunity (should it be worthwhile depending on property value and other creditors).

Here, *two* separate IRS offices in 2005 had the opportunity to review the Government's position as a junior lienholder with respect to 25 Raymond Drive. As evident from the record, the Raymond entity took its chances when providing notice that the IRS would "rear its head," in which case Raymond would probably "collapse [its] tents" and go home. It is unfortunate that for whatever reason the IRS did not evalu-

ate the foreclosure or, perhaps, did so but overlooked what it claims now to have figured out. Either way, this Court is not persuaded Congress intended to give the IRS a "do-over", enabling it to set-aside a senior mortgage and foreclosure as fraudulent after receiving proper notice of a sale, doing no investigation as to the property, and never objecting to or questioning the process by which its junior lien would be wiped out given the value of the property. This is especially so where the Government's action at issue in this case comes after title was transferred to a bona-fide purchaser who went above and beyond in seeing to it that the closing was "by the book," and who diligently confirmed the IRS had exhausted every possible right it had according to statute to preserve its lien.[11]

■ Broadly speaking, the Government is correct that the tax laws prefer substance over form and do not recognize sham transactions that lack real economic effect. *See Del Commercial Prop., Inc. v. Comm'r of Internal Revenue,* 1999 WL 1212447, *3 (U.S.Tax Ct. Dec. 20, 1999) (citing *Gregory v. Helvering,* 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596 (1935)) (laws "do not recognize as valid for tax purposes sham transactions or transactions that have no economic substance"). But to stop there and accept the Government's position would be to ignore the particular framework Congress has constructed as to what "shall" occur upon notice of foreclosure per § 7425(b)(2)(C) and, importantly, the realty that purchasers, banks and title examiners rely on this very process (and the 120–day redemption

11. This is not to say, of course, that the instant analysis or result would apply in every situation where the Government may seek to enforce rights with respect to a tax lien following notice and/or an applicable redemption period. If the point has not been ham-

mered home yet it warrants repeating: the Court does not view its holding on these particular facts as one from which a rule of broad applicability may be easily or properly derived.

period) to ensure they are obtaining clear title to property.

What the Government seems to be saying is that it simply did not have enough information in 2005 to put the pieces of Rose's puzzle together, and there was no way prior to foreclosure or during the redemption period that it could have known the extent of Rose's scheme. This position is perplexing because the Government set forth its fraud theory in detail in its June 2007 Complaint in this case—prior to any discovery. Thus, the Court cannot help but wonder what changed or what more the IRS learned between December of 2005 (foreclosure notice) and June 2007 (Complaint) that allowed the Government to, at last, unravel this tangled title web. As of December of 2005, the Government must have already been on to Rose to some extent, because its 2004 lien named Rose *and* then-owner Borland as his nominee. And, one would think the fact that a $52,000 mortgage had ballooned to more than $400,000 to eliminate, in essence, the IRS's interest would be at least a yellow flag sufficient to spark some interest. For what other purpose are the notice and 120–day redemption provisions, if not to encourage the IRS to perform the due diligence necessary for the Government to make an educated judgment with respect to property in which it has a (significant) financial interest?

This outcome may have an echo of equitable estoppel or laches, but there is no evidence of affirmative IRS misconduct. *See Heckler v. Cmty. Health Servs. of Crawford County, Inc.,* 467 U.S. 51, 61, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (stating that plaintiff bears a substantial burden to establish estoppel against the government). But be that as it may, the result here is firmly grounded in the statutory framework that specifically dictates how and when liens are discharged. Con-

gress determined that the failure of the IRS to respond to adequate notice of a non-judicial sale would discharge a lien. It did not, though it could have, create a fraud exception to the discharge provisions.

Finally, important policy considerations reinforce the appropriateness of the result here. The Government maintains it should not be the case that it loses its right to enforce tax liens simply because it faces a particularly creative and complex scheme that it cannot or does not unravel before a third party bona fide purchaser happens to come along. The levy power of the tax collection system certainly "enhances voluntary compliance in the collection of taxes" that are "the life-blood of government, and their prompt and certain availability an imperious need." *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977) (quoting in part *Bull v. United States,* 295 U.S. 247, 259, 55 S.Ct. 695, 79 L.Ed. 1421 (1935)). No question complex tax evasion schemes pose a challenge to the IRS. But as compelling as this argument may appear, an even more compelling consideration is at play here: bona-fide purchasers like the Beauchamps must be able to rely on the discharge provisions of § 7425(b) to obtain clear and certain title. Ignoring this goal, particularly on these facts, would result in uncertainty and cloud titles and fly in the face of the policy in favor of "*prompt* and *certain* collection of delinquent taxes." *Rodgers,* 461 U.S. at 694, 103 S.Ct. 2132 (emphasis added). The point is that were the Court to permit the Government to foreclose here, buyers, attorneys, banks and title examiners could have no confidence in the finality that § 7425(b) of the tax code purports to provide. If this was allowed, purchasers would not buy, banks would not lend and houses would blight neighborhoods bringing property values down further. On bal-

ance, the IRS's policy arguments must yield to the goals of finality and certainty.

IX. *Conclusion*

The Court need go no further. Though it is not insensitive to the Government's lack of success in pursing other avenues to satisfy Mr. Rose's debt, allowing foreclosure of the 25 Raymond Drive property in this case would run contrary to § 7425 and result in manifest injustice. The Government's motion for summary judgment is DENIED; judgment shall enter on behalf of Defendants.

IT IS SO ORDERED.