**Jürek ZAMOYSKI a/k/a Jerzy Berowski, Plaintiff**

v.

**FIFTY–SIX HOPE ROAD MUSIC LIMITED, INC., et al., Defendants.**

Civil Action No. 08–30125–KPN.

United States District Court, D. Massachusetts.

June 2, 2010.

Timothy J. Ervin Gallant & Ervin, LLC Chelmsford, MA, for Defendants.

Peter R. Irvine, Law Office of Peter, Northampton, MA, Paul C. Rapp, The Law Office of Paul, Housatonic, MA, for Plaintiff.

*MEMORANDUM AND ORDER WITH REGARD TO CROSS MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 24 and 26 )*

NEIMAN, United States Magistrate Judge.

Jürek Zamoyski ("Plaintiff"), an artist who created three visual images of reggae star Bob Marley in the mid–1990s, claims that Marley's estate—represented here by Fifty–Six Hope Road Music Limited, Inc. ("Hope Road"), Bob Marley Music, Inc. ("BMMI"), and Zion Rootswear LLC ("Zion") (together "Defendants")—have infringed on his copyrights. In response, Defendants, who have filed counterclaims, argue that they were granted ownership of the copyrights by Plaintiff's business partner, Richard Rogala ("Rogala"), via a 1995 licensing agreement.

Presently, Defendants seek summary judgment on Plaintiff's two claims—copyright infringement (Count I) and unjust enrichment (Count II)—as well as on their counterclaim for a declaration of copyright ownership in their favor (Counterclaim II). In turn, Plaintiff seeks summary judgment on his copyright infringement claim (Count I) and Defendants' countervailing Counterclaim II, as well as on Defendants' other three counterclaims: breach of contract (Counterclaim I), violation of Mass. Gen. L. ch. 231, § 6F (Counterclaim III), and violation of Mass. Gen. L. ch. 93A (Counterclaim IV).

Pursuant to 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73, the parties have consented to the jurisdiction of this court. For the reasons that follow, the court will allow Defendants' motion with respect to both counts of Plaintiff's complaint (for copyright infringement and unjust enrichment) and will also allow Plaintiff's motion with

respect to Defendants' Counterclaim III (which alleges a violation of Mass. Gen. L. ch. 231, § 6F). In all other respects, the motions will be denied.

## I. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir.1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir.2006).

## II. BACKGROUND

The following factual background covers three areas: (1) identification of the players; (2) activities around the 1995 licensing agreement; and (3) facts bearing on Defendants' statute of limitations and laches arguments. These facts are stated in a light most favorable to Plaintiff, the initial non-moving party.[1]

---

1. Because the court first considers Defendants' motion for summary judgment, these facts come from their Statement of Undisputed Material Facts (pages 2–12 (hereinafter

## A. *The Players*

Hope Road, which is controlled by Bob Marley's surviving children, is the owner of a federal trademark registration in and to the name of "Bob Marley." (Defs.' Facts ¶¶ 5, 6.) Hope Road is also the owner and licensor of certain rights in the name, likeness, and other indicia of the late reggae star. (*Id.* ¶ 6.) In 1995, BMMI was acting as the licensing agent for Hope Road and would enter into and execute licensing agreements relative to the "Marley Rights." (*Id.*) For its part, Zion, in 1999, entered into an agreement with Hope Road which now grants Zion the world-wide exclusive right to use the Marley Rights on t-shirts and hats as well as the non-exclusive right to use the Marley Rights on other general merchandise. (*Id.* ¶ 7.) At all times, moreover, Zion had been authorized by Hope Road to utilize artwork and other materials comprising Bob Marley's name, image, likeness and trademark. (*Id.* ¶ 8.)

In the early 1990s, Plaintiff was an artist working in and around Provincetown, Massachusetts. (*Id.* ¶ 9.) In 1991, Plaintiff met Rogala who became a customer. (*Id.* ¶ 10.) In 1994, Rogala traveled to Provincetown and met with Plaintiff for the purpose of selling some of Plaintiff's works. (*Id.* ¶ 11; Pl.'s Response ¶ 1.) At about the same time, Plaintiff was creating the three Bob Marley images—"Rasta Dreads," "Lion Zion" and "Kaya Man"—that are the subject of this lawsuit. (See Defs.' Facts ¶ 3.) Ultimately, the two men agreed to exploit portraits of celebrities, including Plaintiff's images of Bob Marley, and created a company named Jürek Graphic International ("JIG"). (*Id.* ¶¶ 11, 12.) Plaintiff specifically granted permission for the company to bear his professional artist name "Jürek" in the title. (*Id.* ¶ 12.)

## B. *Activities Around the June 15, 1995 Licensing Agreement*

Following their agreed business arrangement, Plaintiff was aware that Rogala sought to secure licenses to utilize the images of certain celebrities, including Bob Marley. (*Id.* ¶ 13; Pl.'s Response ¶ 2.) At his deposition, Plaintiff admitted his understanding that the exploitation of his Bob Marley images could only occur by securing a license from the parties that controlled the Bob Marley rights. (Def.'s Facts ¶ 14.) Accordingly, Plaintiff provided his creation "Rasta Dreads" to Rogala for use in approaching and attempting to secure a Bob Marley license. (*Id.* ¶ 15.)

Presumably with "Rasta Dreads" in tow, Rogala traveled to BMMI's offices in New York City and met with Stephanie Levine ("Levine"). (*Id.* ¶ 16; Pl.'s Response ¶ 3.) Levine informed Rogala that if he and Plaintiff entered into a license agreement with BMMI, any designs that were created would become the property of BMMI. (Defs.' Facts ¶ 17; Pl.'s Response ¶ 4.) Plaintiff, for his part, was aware and approved of JIG entering into a licensing agreement with BMMI. (Defs.' Facts ¶ 19; Pl.'s Response ¶ 5.)

On June 15, 1995, JIG, in fact, entered into a Licensing Agreement with BMMI (hereinafter "the Licensing Agreement") relative to the use of the name, image, trademark and likeness of Bob Marley on certain products. (Defs.' Facts ¶ 18; Defs.' Ex. 11.) Defendants point to four articles contained therein. Article 4(c) of

"Defs.' Facts") of Defs.' Motion for Partial Summ. J. and Mem. of Reasons in Support (hereinafter "Defs.' Brief")) as well as from Plaintiff's Statement of Disputed Material Facts in Support of his Opposition to Defendants' Motion for Partial Summary Judgment (hereinafter "Pl.'s Response"). Additional facts potentially bearing on Plaintiff's motion for summary judgment are addressed in that portion of the court's discussion below.

the Licensing Agreement provided as follows:

> Licensee [JIG] shall furnish to Licensor [BMMI], at Licensee's cost, such artwork as may be reasonably necessary for the manufacture, advertising and promotion of the Product [the items to be merchandised], subject to Licensor's absolute right of approval. Such artwork shall embody photograph(s) of Artist [Bob Marley] supplied to Licensee by Licensor, at Licensee's expense. All such artwork shall be and remain the property of Licensor, notwithstanding its creation or modification (which is also subject to Licensor's absolute approval) by Licensee, and shall be returned to Licensor after its use by Licensee. Licensee shall not use the artwork in any other manner. Any and all additions to, and new renderings, modifications or embellishments of, the artwork shall, notwithstanding their invention, creation and use by Licensee, be and remain the property of Licensor, and Licensor may use, and license others to use, the same, subject only to the provisions of this Agreement.

(Defs.' Facts ¶ 20.) Article 8(b) then provided, in pertinent part, as follows:

> Upon the termination or expiration of this Agreement, Licensee will be deemed to have assigned, transferred and conveyed to Licensor any trade rights, equities, good will, title or other rights in and to the Artist which may have been created or obtained by Licensee or which may have vested in Licensee in pursuance of any endeavors covered hereby, and Licensee will execute any instruments requested by Licensor to accomplish or confirm the foregoing. . . .

(*Id.* ¶ 21.) Thereafter, Article 11 provided, in pertinent part, as follows:

> Licensee acknowledges that the Licensor is the sole owner of all right, title

and interest in and to the Artist; that any copyright and trademark right or any other rights which may be created in any article, label, design or other material bearing or including the Artist, are and shall be the sole and exclusive property of Licensor; that Licensee has and will hereby acquire no rights in the Artist; that design or other material bearing or including the Artist, other than the right to use the same as herein provided, shall be the exclusive property of the Licensor; and that at no time will Licensee, either during the Term of this Agreement or thereafter, claim any rights therein or register any word, device or symbol confusingly similar to the Artist or any similar or related mark or any copyright or other rights which may be created in any article, label, design or other material bearing the Artist or any similar or related mark, except pursuant to this Agreement. . . .

(*Id.* ¶ 22.) Finally, Article 13 provided, in pertinent part, as follows:

> (a) In all cases where License desired artwork involving the Product which is the subject of this Agreement to be prepared, the cost of such artwork and the time for the production thereof shall be bourne by Licensee. All artwork and designs involving the Artist, or any reproduction thereof shall, notwithstanding their invention or use by Licensee, be and remain the property of Licensor, provided that Licensor shall not make use of such designs or artwork accept [sic] as provided in Paragraph 11 above which shall be entitled to use the same and to license the use of same to others, except on items thereunder during the Term of this Agreement.
>
> . . . .
>
> (d) Licensee specifically agrees that should it obtain photographs, artwork, or other material bearing the Artist for

use in creating the Product hereunder, it shall only use the same after obtaining from the photographer, artist or other creator thereof an assignment of all rights in favor of the Artist. Should Licensee commission the taking or creation any photographs, artwork or other material bearing the artist for use in creating the Product hereunder, Licensee agrees that same shall only be performed as a "work made for hire" commissioned by the Licensee under a "contract of service" pursuant to which Licensee shall be deemed the "author" and production thereof; and Licensee shall promptly thereafter assign all rights in and to such photographs, artwork or other material to the Licensor. (*Id.* ¶ 23.)

In addition, Article 4(b) of the Licensing Agreement required that any images created by JIG had to be submitted to BMMI for approval before any design could be sold. (*Id.* ¶ 24.) To that end, Plaintiff acknowledged at his deposition—although he now avers he acted upon instructions from *Rogala*—that he personally forwarded images depicting Bob Marley, including the three images at issue here, to Levine at BMMI for approval. (*Id.* ¶¶ 25, 27; Pl.'s Response ¶¶ 6, 7.) Plaintiff also acknowledged that BMMI had the final say as to what images could be sold by JIG under the Licensing Agreement. (Defs.' Facts ¶ 26.)

After creating "Lion Zion," Plaintiff photographed it and submitted the photograph to Levine with the following handwritten note:

Dear Stephanie!!

How are you? Is Spring time keeping you warm and hopeful?

Here comes my new painting. I call it "Lion Zion". I am very please[d] with it. I hope you will share my enthusiasm. I would like to bring the more spiritual aspect of Bob Marley to your Bob Marley music merchandising. I hope his message will carry on.

Warm regards,

Jürek

(Defs.' Facts ¶ 29 and Ex. 12; Pl.'s Response ¶ 9.) At his deposition, moreover, Plaintiff acknowledged that he submitted both "Lion Zion" and "Kaya Man" to BMMI on behalf of JIG pursuant to the Licensing Agreement, although he again claims now that those submissions were upon instructions from Rogala. (Defs.' Facts ¶¶ 30, 31; Pl.'s Response ¶ 10.) Regardless, Plaintiff concedes in his summary judgment papers that he "received and was paid monies by JIG related to its sales of Bob Marley items" and that his "role was to create the images." (Defs.' Facts ¶¶ 32, 34; Pl.'s Response ¶ 11.)

Plaintiff also acknowledges that he was aware that the Licensing Agreement ended in 1999. (Defs.' Facts ¶ 33.) As evidence of that fact, Defendants have attached a letter from BMMI to Rogala dated January 29, 1999, formally notifying him, among other things, "that the term of the [Licensing] Agreement shall expire on February 25, 1999, subject to paragraph 15 of the Agreement." (See "Exhibit '2'" to Defs.' Ex. 11.)[2]

C. *Facts Bearing on Defendants' Statute of Limitations and Laches Arguments*

In September of 2003, Plaintiff became aware that Zion was manufacturing, printing and selling the three subject images.

---

**2.** Paragraph 15, entitled "Disposal of Stock Upon Expiration of Term," provided procedures for the Licensee to dispose of products in the event that the Agreement was terminated solely by reason of the passage of time. (Defs.' Ex. 11.)

(Defs.' Facts ¶ 35.) Specifically, Plaintiff reviewed a report prepared by the printer formerly used by JIG—New Buffalo T-shirt Factory ("New Buffalo")—which indicated that New Buffalo was printing the images on behalf of Zion. (*Id.* ¶ 36.) Despite this knowledge, Plaintiff admitted at his deposition that he did not then file suit against Defendants or even contact them about the fact that they were printing, manufacturing and selling items depicting the images. (*Id.* ¶ 37.)

Even so, on October 29, 2003, Plaintiff wrote a letter to Rogala in which he described what appears to be breakdown in their relationship. (Defs.' Facts ¶ 39 and Ex. 17; Pl.'s Response ¶ 13.) For example, Plaintiff chastised Rogala for, among other things, continuing to use a "fraudulent" JIG contract that "doesn't exist" because the company "died in March 1999 when the Bob Marley license was cancelled." (Defs.' Ex. 17.) At the end of his letter, Plaintiff told Rogala that "[w]hat we need to do first is define who you can safely pursue and who needs to be left alone" and that "[w]e cannot go after the Marley family and their printer as it will kill the purpose of the designs and they will cease to be marketable." (*Id.*) Presently, Plaintiff avers that, "in 2003[, he] did not want to litigate with the Defendants out of respect for the memory of Bob Marley and in hopes that an agreement would be reached by which he would be paid royalties for past and future sales, and that Defendants would continue to market products containing the [disputed images]." (Pl.'s Response ¶ 13.)

On July 23, 2004, however, Plaintiff filed copyright registrations for the disputed images. (Defs.' Facts ¶ 41; Defs.' Exs. 4–6.) Then, in a letter to New Buffalo dated February 16, 2005, with a "Cc" to Zion, Plaintiff's attorney claimed that Plaintiff owned the copyrights to the images and demanded that Zion and New Buffalo cease their infringement. (*Id.* ¶ 42; Defs.' Ex. 18; Pl.'s Response ¶ 16.) By letter dated February 23, 2005, Zion's attorney responded expressly repudiating, on behalf of Defendants, Plaintiff's claimed ownership of the copyrights via reference to the Licensing Agreement. (Defs.' Facts ¶ 43.) The next day, February 24, 2005, Plaintiff's attorney wrote back acknowledging receipt of the Licensing Agreement but questioning Defendants' ownership allegations. (*Id.* ¶ 44; Pl.'s Response ¶ 17.)

Plaintiff filed the instant complaint on June 30, 2008. Plaintiff acknowledged at his deposition that this was nearly five years after he allegedly first learned (in September of 2003) that Defendants were manufacturing and selling products depicting the disputed images and more than three years after the parties' correspondence (in February of 2005) about alleged copyright infringement. (Defs.' Facts ¶ 46.) When asked about the delay, Plaintiff essentially agreed that he did "nothing" for a long time:

Q: And what, if anything, did you do as a result of learning that in September of 2003 [Defendants were selling your alleged copyrighted designs] with regard to any of the Defendants in this case?

A: I haven't done anything. I was unable to do anything.

Q: You didn't file a lawsuit against them in September, 2003?

A: No.

Q: Did you contact anybody at Bob Marley Music, Inc., or Zion Rootswear or Fifty-six Hope Road Music about the fact that they were manufacturing and selling these T-shirts with your items at issue?

A: No.

. . . .

Q: And what, if anything, happened after you sent this letter [from his attorney dated February 16, 2005]?

A: Nothing happened. I went to Europe, came back and there was— Nothing happened, basically.

(Defs.' Facts ¶¶ 40, 45, 47; Defs.' Ex. 7 (Pl.'s Depo.) at 115–16, 123.) Plaintiff now avers that he "did not pursue the Defendants during the period from 2003–2008 for a variety of reasons":

> It was not until February 2005 that Plaintiff learned that Defendants were wrongly claiming copyright ownership over the Items at Issue. Plaintiff could not afford to pay his attorney who was demanding money to proceed with this case in 2005. Plaintiff further suffered various health problems during this period that made it impossible for him to pursue the matter.

(Pl.'s Response ¶ 14.)

### III. DISCUSSION OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

As noted, Defendants seek summary judgment on Plaintiff's claims of copyright infringement (Count I) and unjust enrichment (Count II) as well as on their counterclaim seeking a declaration of copyright ownership in their favor (Counterclaim II). For the following reasons, the court will allow Defendants' motion as to Plaintiff's two causes of action but will deny Defendants' motion with respect to their declaratory judgment counterclaim.

#### A. Copyright Infringement (Count I)

Most of the parties' ammunition is directed at Plaintiff's Count I, his claim that Defendants have infringed his three "copyrighted" images of Bob Marley. For the reasons which follow, this claim is time-barred.

■ Plaintiff concedes that, in order to prevail on his copyright infringement claim, he must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). *Accord Situation Mgmt. Sys. v. ASP Consulting LLC,* 560 F.3d 53, 58 (1st Cir.2009). (See Mem. Law in Supp. of Pl.'s Cross–Motion for Summ. J. (hereinafter "Pl.'s Brief 2") at 4.) Asserting that Defendants do not contest element two, Plaintiff maintains that "[t]he only issue before the Court is therefore the element of ownership of the copyrights to the [disputed images]." (*Id.*) As Defendants point out, however, Plaintiff's focus on the ownership issue puts him squarely in the cross-hairs of the copyright statute which provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b).

■ According to the First Circuit, a claim under the copyright statute "accrues when a plaintiff knows or has reason to know of the act which is the basis for the claim." *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. KG.,* 510 F.3d 77, 88 (1st Cir.2007) (citation and internal quotation marks omitted). Usually, when a plaintiff undisputedly owns the copyright and the sole question is whether the defendant's work is infringing, the statute's three-year limitations period—vis-a-vis ownership—is not an issue. When, however, a plaintiff is put on notice that the *defendant* is claiming ownership, the statute's limitation period accrues the moment the plaintiff knows or has reason to know of the defendant's claim of ownership. *See id.* at 81 (affirming summary judgment in favor of defendants because plaintiff was "put on sufficient notice to result in accrual more than three years before [it] initiated suit");

*Santa–Rosa v. Combo Records,* 471 F.3d 224, 227 (1st Cir.2006) (plaintiff's claim time-barred because he waited more than three years before seeking to advance a copyright claim of ownership); *Netzer v. Continuity Graphic Assocs.,* 963 F.Supp. 1308, 1315 (S.D.N.Y.1997) ("An express assertion of sole authorship or ownership will start the copyright statute of limitations").

■ In this regard, it is of no moment that a plaintiff may not, technically, be seeking a declaration of ownership. "[W]hen the gravamen of a plaintiff's copyright claims is ownership, ... the infringement claims are barred if the ownership claim is time-barred." *Barksdale v. Robinson,* 211 F.R.D. 240, 246 (S.D.N.Y.2002) (citation omitted). As the First Circuit recently explained: "The omission [of a request for a declaration of ownership] does not remove the predicate question of ownership from the case.... It would be anomalous and, we think, contrary to congressional language and intent not to apply the Act's limitations period when the Act governs the question of ownership interest." *Cambridge,* 510 F.3d at 85. *See also Minder Music Ltd. v. Mellow Smoke Music Co.,* 1999 WL 820575, at *2 (S.D.N.Y. Oct. 14, 1999) ("Although plaintiff attempts to portray its claim as one for an ongoing infringement, it has been established that the statute of limitations cannot be defeated by portraying an action as one for infringement when copyright ownership rights are the true matter at issue.") *and Poindexter v. Warner/Chappell Music, Inc.,* 2009 WL 302064, at *4 (S.D.N.Y. Feb. 9, 2009) (similar).

■ Applying the law to Plaintiff's Count I is relatively straightforward. As noted, Plaintiff has specifically indicated that the *only* element to be determined is ownership of the disputed Bob Marley images. Hence, his cause of action accrued the moment he was put on notice of Defendants' claim of ownership. That occurred as early as September of 2003 (when Plaintiff allegedly first learned that Defendants were manufacturing and selling products depicting the disputed images) or as late as February 23, 2005 (when Defendants undisputedly advised him that they were repudiating his claim of ownership). In either case, more than three years passed before Plaintiff initiated the instant lawsuit on June 30, 2008. Accordingly, Plaintiff's present claim of copyright infringement is untimely.

Before moving on, however, the court wishes to address three additional points. First, Plaintiff, curiously, asserts in his opposition memorandum that "[t]he gravamen of the Complaint is copyright *infringement,* not copyright *ownership.*" (Mem. Law in Support of Pl.'s Opp'n to Defs.' Motion for Partial Summ. J. (hereinafter "Pl.'s Brief 1") at 3 (emphasis added).) As Defendants note, however, that assertion is flatly contradicted by Plaintiff's own cross-motion where, as described, he concedes that "[t]he *only* issue before the Court is ... the element of ownership." (Pl.'s Brief 2 at 4 (emphasis added).) Similarly, the parties' correspondence in February of 2005 makes clear that ownership of the copyrights has always been the central focus of their dispute. (See Defs.' Ex. 18 (Plaintiff's attorney's February 16, 2005 letter asserting that Plaintiff is "the creator and copyright holder" and that Defendants "must immediately cease and desist using [his] artwork"), Defs.' Ex. 19 (February 23, 2005 response by Defendants' attorney which "disagree[d] with your assertion that Jurek is the copyright holder," asserted that Plaintiff "lacks the authority to claim any rights in and to these designs" and notified Plaintiff that he must "cease claiming any right, title and ownership in and to the artwork") and Pl.'s Ex. H (February 24, 2005 letter from Plaintiff's attorney acknowledging receipt of the February 23,

2005 letter and the Licensing Agreement).) Even Plaintiff's own complaint and summary judgment affidavit concede the primacy of the ownership issue with respect to his present copyright infringement cause of action. (See, *e.g.*, Compl. ¶¶ 9, 15; Pl.'s Aff. ¶¶ 28, 36, 37.)

Second, and relatedly, the two principal cases relied on by Plaintiff—*Ediciones Musicales Y Representacionales Internacionales, S.A. v. Matea San Martin*, 582 F.Supp.2d 1358 (S.D.Fla.2008), and *Carell v. Shubert Org., Inc.*, 104 F.Supp.2d 236 (S.D.N.Y.2000)—are inapposite. *Ediciones* involved a unique situation where the plaintiff claimed to have a 1972 Mexican copyright and the defendants claimed to have a 1988 United States copyright to the same song. *Id.*, 582 F.Supp.2d at 1359. In 2008, the plaintiff sued the defendants for copyright infringement. *Id.* The court ruled that the plaintiff would have been unable to have obtained a declaration of ownership to the United States copyright as such a claim would have accrued in 1988 and, hence, would have been significantly time-barred. *Id.* at 1360. In an admittedly atypical twist, however, the court allowed the plaintiff's infringement claim to proceed (at least past the threshold motion to dismiss stage) specifically because there was "no suggestion that the Defendants ... ha[d] any type of ownership interest in the Plaintiff's Mexican copyright." *Id.* To get there, the court had to distinguish *Barksdale* and *Minder Music* (and their progeny) by observing that, in those cases, "the copyright infringement claims depended on a determi-

nation of sole ownership because a defendant cannot infringe on his or her own copyright." *Id.* & n. 3. *See also Carell*, 104 F.Supp.2d at 254 (allowing infringement action to survive a motion to dismiss despite latent, time-barred ownership claims because the "plaintiff's infringement claim [was] separate and distinct from the adjudication of her ownership claims").[3]

The instant case, however, is more like the *Barksdale* and *Minder Music* line of cases than *Ediciones* and *Carell*. Unlike in *Ediciones*, both sides here have argued that they are entitled to sole ownership. (See, *e.g.*, Pl.'s Brief 1 at 20 ("Plaintiff ... alleges his sole ownership[,] an allegation disputed ... only by the Defendant[s'] facially wrong allegation that a contract to which Plaintiff was not a party purports to have transferred his copyrights to Defendants.").) Further, as in *Minder Music* but not *Carell* (see n. 3 *supra*), Plaintiff himself has said that ownership—not infringement—is "the only issue before the Court." (Pl.'s Brief 2 at 4.) In addition, there is no complicating foreign copyright here. *Compare Ediciones*, 582 F.Supp.2d at 1359–60. And finally, unlike in both *Ediciones* and *Carell*, the court is concerned at this summary judgment stage with more than simply determining (pursuant to Rule 12(b)(6)) whether or not Plaintiff has pled " 'enough facts to state a claim to relief that is plausible on its face.' " *Ediciones*, 582 F.Supp.2d at 1359 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). *See also Carell*, 104 F.Supp.2d at

3. The court recognizes that the concept of "sole ownership" does not appear to be as much of a driving force behind the Rule 12(b)(6) decision in *Carell* by District Judge Allen G. Schwartz (who also decided *Minder Music*) as it was in *Ediciones*. Nonetheless, it was extremely important to Judge Schwartz—in distinguishing *Carell* from *Minder Music*—that the "gravamen of [the *Carell*]

plaintiff's copyright claims [was] infringement, not ownership" whereas, in *Minder Music*, "ownership ... was ... the critical element of the case, and [so I] reasoned [there] that because that claim was barred, the infringement claim was also barred." *Carell*, 104 F.Supp.2d at 254 (citing *Minder Music*, 1999 WL 820575, at *2).

254 (observing that "[d]ismissal is inappropriate ... unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief"). As noted, Plaintiff's burden here is more focused; he must place at least one material fact into dispute, something he has not done with respect to the statute of limitations question.

■■ Third, Defendants have raised a strong argument that laches also bars Plaintiff's claim of copyright infringement. As the parties are well aware, "laches is an equitable doctrine, within the sound discretion of the district court." *Doyle v. Huntress, Inc.*, 513 F.3d 331, 335 (1st Cir.2008) (citations and internal quotation marks omitted). "The substantive content of the laches doctrine requires focus on whether the plaintiff's delay in bringing suit was unreasonable and whether that delay caused prejudice to defendant." *Id.* (citing *TAG/ICIB Servs., Inc. v. Pan Am. Grain Co.*, 215 F.3d 172, 175 (1st Cir.2000)). Here, Defendants persuasively argue that Plaintiff's delay in filing suit was unreasonable. Indeed, neither at deposition nor in his more recent affidavit does Plaintiff offer any meaningful excuse for his tardiness. (See, *e.g.*, Pl.'s Depo. at 123 ("Nothing happened [after February of 2005]. I went to Europe, came back and there was—Nothing happened, basically.") and Pl.'s Response ¶ 14 (averring simply that Plaintiff suffered "health problems" and could not afford to pay his attorney).) Defendants have also implied that Plaintiff's unreasonable delay caused them to suffer prejudice.

Nonetheless, the court will not ground its dismissal of Plaintiff's Count I on Defendants' laches defense. For one thing, it appears unsettled whether laches may actually be applied in a copyright action that is explicitly governed by the three-year limitations period of 17 U.S.C. § 507(b). *See, e.g., Lyons Pshp., L.P. v. Morris Cos-*

*tumes, Inc.*, 243 F.3d 789, 797 (4th Cir. 2001); *Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583, 586 (9th Cir.1993). Moreover, Defendants' laches defense involves a further factual inquiry that cannot be easily resolved at summary judgment. *See Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir.2000) ("Because the application of laches depends on a close evaluation of all the particular facts in a case, it is seldom susceptible of resolution by summary judgment."); *PSN Ill., Inc. v. Ivoclar Vivadent, Inc.*, 398 F.Supp.2d 902, 906 (N.D.Ill.2005) (similar); *Herman Miller, Inc. v. A. Studio s.r.l.*, 2006 WL 1307904, at *11 (W.D.Mich. May 9, 2006) (similar). Finally, the laches argument is now mere surplusage given the court's conclusion that Plaintiff's copyright infringement is time-barred under section 507(b).

As indicated, Plaintiff's infringement cause of action clearly accrued either in September of 2003 or February of 2005 and, hence, his claim for copyright infringement filed on June 30, 2008, was too late. Accordingly, Defendants' motion with respect to Plaintiff's Count I will be allowed.

### B. *Unjust Enrichment (Count II)*

Plaintiff's claim for unjust enrichment (Count II) can be dealt with in short order. Plaintiff agreed with Defendants at oral argument that this claim is preempted by the Copyright Act, 17 U.S.C. § 301(a). The court agrees as well. Accordingly, Defendants will also be granted summary judgment as to Plaintiff's Count II.

### C. *Declaration of Copyright Ownership (Counterclaim II)*

■ Although Defendants also move for summary judgment in their favor with respect to their counterclaim for copyright ownership (Counterclaim II) (see Defs.' Motion at 2, 28), their argument focuses

entirely on the reasons why *Plaintiff* cannot recover on *his* causes of action (see *id.* at 13 ("*Plaintiff's Claims are Barred* by the Applicable Statute of Limitations ..."), 19 ("Alternatively, *Plaintiff's* Copyright and Unjust Enrichment *Claims are Barred* by the Doctrine of Laches") and 22 ("... *Plaintiff's Claims are Barred* as Plaintiff is not the Rightful Holder of any Copyright ...") (emphasis added)). Still, Defendants assert towards the end of their brief that the facts are so one-sided that the ownership issue can only be resolved in their favor. (See Defs.' Motion at 22–27.)

The Licensing Agreement, as indicated, appears to clearly place ownership in the hands of BMMI, not JIG.[4] To bind Plaintiff, however, Defendants have to demonstrate that he knew and assented to the Licensing Agreement, *i.e.*, that he vested JIG with at least "apparent authority" to agree to its terms on his behalf. *See Theos & Sons, Inc. v. Mack Trucks, Inc.,*

431 Mass. 736, 729 N.E.2d 1113, 1120–21 (2000), *and DeVaux v. Am. Home Assur. Co.,* 387 Mass. 814, 444 N.E.2d 355, 358 (1983) (both discussing apparent authority). *See also Jalbert v. Grautski,* 554 F.Supp.2d 57, 70 (D.Mass.2008) ("Under Massachusetts law, if an agent has the apparent authority to authorize something and a third-party reasonably relies on that authorization, the third-party may hold the principal to the consequences of such reliance.") (citing *Binkley Co. v. Eastern Tank, Inc.,* 831 F.2d 333, 337–38 (1st Cir. 1987)). Here, however, Defendants' argument falls short, at least for summary judgment purposes.

Granted, Defendants do make a colorable argument regarding apparent authority, pointing to circumstantial evidence that Plaintiff knew of and condoned JIG's activities as taken by Rogala. For example, Defendants note the undisputed fact that Plaintiff was aware and approved of JIG entering into some form of licensing agree-

---

4. For example, the Licensing Agreement contains the following provisions:

- Paragraph 4(c) provides that the "artwork shall be and remain the property of [BMMI]" and that "[a]ny and all additions to, and new renderings, modifications or embellishments of, the artwork shall, notwithstanding their invention, creation and use by [JIG], be and remain the property of [BMMI]";
- Paragraph 8(b) provides that, upon termination or expiration of the agreement, JIG "will be deemed to have assigned, transferred and conveyed to [BMMI] any trade rights, equities, good will, title or other rights in and to the Artist which may have been created or obtained by [JIG]";
- In Paragraph 11, "[JIG] acknowledged that [BMMI] is the sole owner of all right, title and interest in and to the Artist";
- In Paragraph 11, "[JIG] acknowledged that ... any copyright and trademark right or any other rights which may be created in any article, label, design or other material bearing or including the Artist, are and shall be the sole and exclusive property of [BMMI]";
- In Paragraph 11, "[JIG] acknowledged that ... [JIG] has and will hereby acquire no rights in the Artist";
- In Paragraph 11, "[JIG] acknowledged that ... design or other material bearing or including the Artist, other than the right to use the same as herein provided, shall be the exclusive property of the [BMMI]";
- In Paragraph 11, "[JIG] acknowledged that ... at no time will [JIG], either during the Term of this Agreement or thereafter, claim any rights therein or register any word, device or symbol confusingly similar to the Artist or any similar or related mark or any copyright or other rights which may be created in any article, label, design or other material bearing the Artist or any similar or related mark, except pursuant to this Agreement"; and
- Paragraph 13 provides that "[a]ll artwork and designs involving the Artist, or any reproduction thereof shall, notwithstanding their invention or use by [JIG], be and remain the property of [BMMI]."

(Defs.' Facts ¶¶ 20–23.)

ment with BMMI. Defendants also cite Plaintiff's deposition testimony to the effect that, pursuant to the Licensing Agreement, he submitted both "Lion Zion" and "Kaya Man" to BMMI on behalf of JIG and that he "received and was paid monies by JIG related to its sales of Bob Marley items." Summary judgment, however, can be rendered only when it is shown "that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law". Fed.R.Civ.P. 56(c)(2). That is not the situation here. A reasonable jury could rely on several facts which cut against JIG's apparent authority. For example, a reasonable jury could take into account the following: (1) the Licensing Agreement was signed by Rogala, on behalf of JIG, not Plaintiff; (2) there appears to be no written agreement between Plaintiff and JIG; (3) Plaintiff's claim that he was never informed that the Licensing Agreement purported to transfer the copyrights to the disputed Bob Marley images; (4) evidence that Plaintiff did not actually see the Licensing Agreement until February of 2005; (5) Plaintiff's filing his own copyright registrations for the disputed images on July 23, 2004; and (6) Defendants having never attempted to register their own copyrights with respect to the images.

Further, and perhaps most importantly, the question of "[w]hether apparent authority exists is [typically] a question of fact," *Kansallis Fin. v. Fern,* 40 F.3d 476, 480 (1st Cir.1994) (citing *Consolidated Rail Corp. v. Hallamore Motor Transp., Inc.,* 394 Mass. 56, 473 N.E.2d 1137, 1139 n. 2 (1985)), and, hence, not easily amenable to summary disposition. *See also Foisy v. Royal Maccabees Life Ins. Co.,* 356 F.3d 141, 150 (1st Cir.2004) ("Whether an individual has acted as an agent is a question of fact.") (citing *Pedersen v. Leahy,* 397 Mass. 689, 493 N.E.2d 486, 487 (1986)). In this regard, while Defendants allude to the fact that, to prove apparent authority, they must show their reasonable reliance on Plaintiff's purported authorization, their argument in this regard contains virtually no details.[5]

In sum, even though Plaintiff, because of the statute of limitations, has lost the right to claim copyright infringement, and even though Defendants have posited strong facts and legal precedent with respect to the concept of apparent authority, Defendants' present argument does not, as a matter of law, demonstrate that they are *a fortiori* entitled to a declaration of ownership to the disputed images. Rather, for the reasons discussed, the question of authority—and hence the underlying question of copyright ownership—must be resolved at a later time upon a more fully-developed record. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct.

---

**5.** At most, Defendants assert that "Hope Road's representative testified that BMMI relied upon the representations of Jurek and JIG when the Licens[ing] Agreement was negotiated and further when JIG and Jurek followed the terms of the Licensing Agreement to the letter." (Defs.' Motion at 25.) But the snippets of deposition testimony they attach (Defs.' Ex. 14) do not mention the issue of reliance. Needless to say, the court is neither in the business of creating a party's argument nor justified in molding the summary judgment standards so as to possibly fulfill a party's intent. *See Sonoran Scanners, Inc. v.* *PerkinElmer, Inc.,* 590 F.Supp.2d 196, 204 (D.Mass.2008) ("As the First Circuit has repeatedly held, '[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.' ") (quoting *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990)). *Cf. Cabán Hernández v. Philip Morris USA, Inc.,* 486 F.3d 1, 8 (1st Cir.2007) (noting that federal and local summary judgment rules "are meant to ease the district court's operose task and to prevent parties from unfairly shifting the burdens of litigation to the court").

2505, 91 L.Ed.2d 202 (1986) (court should act "with caution in granting summary judgment" and deny it "in a case where there is reason to believe that the better course would be to proceed to a full trial"). *Accord Unwin v. Campbell,* 863 F.2d 124, 140 (1st Cir.1988) (Breyer, J., dissenting). *See also* 10A Wright, Miller & Kane, *Fed. Prac. & Proc.* § 2728 (3d ed.2010) (the court has "the freedom to allow the case to continue to when it has any doubt as to the wisdom of terminating the action prior to a full trial") (collecting cases). Accordingly, Defendants' motion with respect to their Counterclaim II will be denied.

IV. *DISCUSSION OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT*

As noted, Plaintiff affirmatively seeks summary judgment with respect to his copyright infringement claim (Count I), as well as all of Defendants' counterclaims, *i.e.,* breach of contract (Counterclaim I), declaration of copyright ownership (Counterclaim II), violation of Mass. Gen. L. ch. 231, § 6F (Counterclaim III), and violation of Mass. Gen. L. ch. 93A (Counterclaim IV). To address Plaintiff's cross-motion for summary judgment, the court will first describe some additional facts, this time viewed in a light most favorable to Defendants, the parties opposing Plaintiff's motion. Afterwards, the court will address the infringement and ownership claims and then turn to Defendants' other counterclaims. In the end, the court will conclude that Plaintiff is entitled to summary judgment only with respect to Defendants' Counterclaim III.

A. *Additional Facts*

The following additional facts are stated in a light most favorable to Defendants. These facts are taken from Plaintiff's Statement of Undisputed Material Facts in Support of his Cross–Motion for Summary Judgment (hereinafter "Pl.'s Facts") as well as from Defendants' Response to Plaintiff's Statement of Undisputed Material Facts (hereinafter "Defs.' Response").

It is undisputed that Plaintiff was the original "author" of the disputed Bob Marley images. (Pl.'s Facts ¶ 1; Defs.' Response ¶ 1.) Plaintiff, however, goes on to assert that he, personally, never signed any document which transferred ownership of his 2004 copyrights to anyone else, that the Licensing Agreement was entered into between *JIG* and *BMMI* (via *Rogala*), not him, and that he was neither an employee, officer or director of JIG. (Pl.'s Facts ¶¶ 2–5; Defs.' Response ¶¶ 2–5.) In response, Defendants note that, according to Rogala's testimony, Plaintiff, in fact, worked on behalf of JIG—including as its chief designer and by submitting designs to BMMI—and that he may have even been an officer or director of JIG. (Defs.' Response ¶ 4.)

Regardless, Defendants do not materially dispute Plaintiff's next assertion: that he believed he "had a handshake deal with JIG by which JIG would license the [disputed images] from Plaintiff, and manufacture and distribute t-shirts bearing the images ... pursuant to a license from Defendants for the use of Bob Marley's right of publicity." (Pl.'s Facts ¶ 6; Defs.' Response ¶ 6.) Defendants simply point out that the Licensing Agreement ostensibly went far beyond what Plaintiff contemplated in his "handshake deal"; it purported to actually transfer ownership of the disputed images from JIG to BMMI. (Defs.' Response ¶ 6.)

Continuing, Plaintiff, for his part, points out the following: that Defendants terminated the Licensing Agreement in 1999; that, shortly thereafter, JIG was dissolved through a bankruptcy proceeding; and that Defendants have continued to license, manufacture, distribute, and sell t-shirts and/or other products bearing the disputed images. (Pl.'s Facts ¶¶ 7–9.) Plaintiff also

notes, again, that he filed copyright registrations for the images in 2004. (*Id.* ¶ 10.) Defendants do not factually dispute these assertions; they simply argue that they are immaterial. (Defs.' Response ¶¶ 7–10.)

### B. *Copyright Infringement (Count I)*

Turning to Plaintiff's arguments, the court finds that, even in light of Plaintiff's additional factual assertions, his Count I—claiming copyright infringement—can be resolved quickly. Since, as indicated above, Defendants' statute of limitations-based argument entitles it to summary judgment on the copyright infringement claim, Plaintiff is not entitled to judgment in his favor on Count I.

### C. *Declaration of Copyright Ownership (Counterclaim II)*

For similarly obvious reasons noted above with respect to *Defendants'* motion for summary judgment, the court is in no position to enter summary judgment in *Plaintiff's* favor on Counterclaim II, Defendant's request for a declaration of copyright ownership. First, as indicated, Defendants have made a colorable—indeed, strong—claim of apparent authority, *i.e.,* that Plaintiff vested JIG with the authority to enter into the Licensing Agreement which, in turn, ostensibly transferred ownership of the disputed images to BMMI. Second, Defendants have also posited a convincing argument that Plaintiff's infringement claim, which is itself premised on the question of ownership, is barred by the statute of limitations. Just as it denied *Defendants'* motion vis-a-vis the ownership issue, the court has little choice but to deny as well *Plaintiff's* motion with respect to Counterclaim II.

### D. *Breach of Contract (Counterclaim I)*

■ Plaintiff's motion with respect to Counterclaim I—alleging breach of contract—consists of a single sentence. "This claim must be dismissed," Plaintiff asserts,

"for the simple reason that Plaintiff was not a party to the [Licensing] Agreement, and Defendants cannot articulate any theory by which Plaintiff might be otherwise held liable for any breach thereto." (Pl.'s Brief 2 at 6.) In response, Defendants assert that Plaintiff is bound by the Licensing Agreement via the concept of apparent authority and, moreover, that he breached the agreement when he purported to register copyrights to the disputed images in 2004.

The court finds Defendants' argument more persuasive for summary judgment purposes. Put simply, since the court, as indicated, finds strength in Defendants' apparent authority argument, it deems it premature to enter summary judgment in Plaintiff's favor on Defendants' breach of contract cause of action. Accordingly, Plaintiff's motion with respect to Counterclaim I will also be denied.

### E. *Mass. Gen. L. ch. 231, § 6F (Counterclaim III)*

At oral argument, Defendants agreed to the entry of summary judgment in Plaintiff's favor on Counterclaim III, their allegation that Plaintiff violated Mass. Gen. L. ch. 231, § 6F, by bringing a "frivolous" or "bad faith" lawsuit. Accordingly, Plaintiff's motion in this regard will be allowed.

### F. *Mass. Gen. L. ch. 93A (Counterclaim IV)*

■ Plaintiff's argument seeking summary judgment on Counterclaim IV—Defendants' chapter 93A cause of action—is also unavailing. Plaintiff's argument, without elaboration, simply asserts that he "has brought an objectively reasonable claim for copyright infringement." (Pl.'s Brief 2 at 7.) That may be true, but, as Defendants point out, their claim of "unfair and deceptive" practices is focused on several circumstances, some of which involve

the unresolved question of apparent authority. Accordingly, Plaintiff's motion with respect to Counterclaim IV will be denied as well.

### V. CONCLUSION

For the reasons stated, Defendants' motion for partial summary judgment is ALLOWED with respect to both of Plaintiff's claims (Counts I and II), but DENIED with respect to Defendants' Counterclaim II. In addition, Plaintiff's cross-motion for summary judgment is ALLOWED with respect to Defendants' Counterclaim III, but otherwise DENIED. In order to determine the next steps in this case, the clerk shall set this matter down for a case management conference within 20 days.

IT IS SO ORDERED.